1  **Pierce Sergenian LLP**
   John M. Pierce (SBN 250443)
2  john@piercesergenian.com
   David A. Sergenian (SBN 230174)
3  david@piercesergenian.com
   633 West 5th Street, 26th Floor
4  Los Angeles, CA 90071
   (213) 223-2340
5

6  Attorneys for plaintiff

7

8          THE UNITED STATES DISTRICT COURT
9       FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  **Anthony Pompliano,** an individual,   | Case No. 2:17-cv-3664
                                            | **Complaint for:**
12                 plaintiff,

13          v.                                1.  **Violation of Dodd-Frank
                                                  Whistleblower Statute [15 U.S.C.
14  **Snap Inc., d.b.a. Snapchat,** a            § 78u-6]**
    Delaware corporation; **Evan Spiegel,**
15  **Brian Theisen**, **Imran Khan**, and   2.  **Violation of California's
    Does 1 through 10, individuals,              Whistleblower Statute [Cal. Labor
16                                               Code § 1102.5]**
                   defendants.
17                                           3.  **Wrongful Termination in Violation
                                                 of Public Policy**
18
                                             4.  **Fraudulent Inducement of
19                                               Employment Contract [Cal. Labor
                                                 Code § 970]**
20
                                             5.  **Breach of Contract**
21
                                             6.  **Breach of the Covenant of Good
22                                               Faith and Fair Dealing**

23                                           7.  **Intentional Infliction of
                                                 Emotional Distress**
24
                                             8.  **Violation of California Labor Code
25                                               § 201,** *et seq.*

26                                           9.  **Misrepresentation Preventing
                                                 Former Employee from Obtaining
27                                               Employment [Cal. Labor Code
                                                 § 1050]**
28
                                             **Jury Trial Demanded**

                                             **PUBLIC REDACTED VERSION**

---

COMPLAINT

## SUBJECT MATTER JURISDICTION AND VENUE

1.     This is an action for violation of 15 U.S.C. § 78u-6, California Labor Code §§ 201, *et seq.*, 970, 1050, *et seq.*, 1102.5, and for state law claims for wrongful termination in violation of public policy, breach of contract, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress.

2.     The Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §§ 1331 and 1332, and under principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## PRELIMINARY STATEMENT

4.     This action arises out of the avarice of a small group of executives at the helm of social media giant Snapchat who have been falsely representing its key performance metrics—such as user growth and engagement figures—to advertisers, the media, the public, and investors in an effort to inflate Snapchat's valuation prior to taking the company public in its recent multi-billion-dollar initial public offering ("IPO"). Snapchat let nothing stand in its way of its IPO, including its obligations to represent material facts accurately.

5.     Plaintiff Anthony Pompliano's refusal to participate in Snapchat's institutional pandemic of mispresenting key industry metrics to its employees, investors, trading partners, advertisers, and media, and his insistence that Snapchat comply with its obligations under federal law to disseminate to investors truthful information, led to his unlawful termination by defendant Snapchat and a smear campaign to ruin his career.

6.     Driven by its fierce rivalry with Facebook—a spurned suitor turned keen competitor—Snapchat fraudulently induced Mr. Pompliano away from Facebook to run Snapchat's new user growth and engagement team by falsely representing to him, among other things, the Company's growth. Throughout the recruiting process,

Snapchat represented to Mr. Pompliano that Snapchat had been experiencing double-digit, month-over-month growth in its active user base, and that it had already acquired 100 million daily active users. Both metrics were false.

7.     At the outset of his remarkably short, three-week tenure at Snapchat, Mr. Pompliano learned that these representations were false and that the company used these same false metrics in representations to advertisers, the public, and to private investors when raising capital.  Mr. Pompliano urged Snapchat to make corrective disclosures by reporting the issue to the highest levels of management, but he was rebuffed.

8.     When Mr. Pompliano alerted Drew Vollero, Snapchat's Vice President of Finance and the architect of Snapchat's planned IPO, to the falsity of Snapchat's representations, Mr. Vollero agreed that the metrics Snapchat had been using were false, and that it was imperative that they be corrected. Mr. Pompliano also informed Jill Hazelbaker, Snapchat's Vice President of Communications, that the company should stop falsely representing to advertisers and others that it had 100 million daily active users. Ms. Hazelbaker told Mr. Pompliano that she had previously asked defendant Evan Spiegel (Snapchat's CEO), to stop disseminating inaccurate metrics, and he had ignored her. Mr. Pompliano further wrote to Brian Theisen, Snapchat's then-Director of Business Operations and a former Facebook employee, and explained that the public and Snapchat's advertisers were being misled, and urged that the company's false representations be corrected. These efforts, which should have been rewarded, wound up costing Mr. Pompliano his job.

9.     Snapchat's leadership saw Mr. Pompliano as an impediment to their imminent IPO because he refused to turn a blind eye to Snapchat's misrepresentations. Indeed, Snapchat accurately perceived that Mr. Pompliano would "blow the whistle" (which he did, internally) should Snapchat continue to misrepresent its user metrics to the public, advertisers, prospective employees, private investors, or in connection with its upcoming IPO.

10.     It also became quickly apparent that the real reason Snapchat hired Mr. Pompliano away from Facebook was not to build a growth team, but for the nefarious purpose of obtaining Facebook's confidential and proprietary information, and enlisting Mr. Pompliano to help identify and poach key Facebook employees, notwithstanding the fact that Snapchat knew—and Mr. Pompliano repeatedly reminded them—that doing so would violate the confidentiality and non-solicitation agreements he signed with Facebook. Snapchat nevertheless repeatedly pressured Mr. Pompliano to breach his agreements by divulging Facebook's confidential information and assisting Snapchat in soliciting Facebook employees. Mr. Pompliano's refusal drew the ire of Snapchat's senior management. In fact, his efforts to file a written record of these improper solicitations to breach his non-disclosure agreement with Facebook were met with his termination from Snap shortly thereafter.

11.     For these reasons, just three weeks into his tenure at Snapchat, the company retaliated against Mr. Pompliano by summarily and wrongfully terminating his employment in violation of public policy. It is apparent that Snapchat's conduct was malicious because, among other things, Snapchat terminated Mr. Pompliano even though there was not one negative comment in his employment file.

12.     Because the truth concerning Mr. Pompliano's termination was so potentially damaging to Snapchat's planned IPO, terminating him wasn't enough to ensure the public was kept in the dark. Accordingly, post-termination, Snapchat has sought to destroy his career and reputation by waging a smear campaign against Mr. Pompliano by making false representations concerning the circumstances of his termination. Even after Mr. Pompliano filed for an injunction in state court, in an effort to put an end to Snapchat's continuing disparagement of him, Snapchat continues to besmirch his good name to the media at every opportunity, even resorting to maliciously republishing inaccurate articles and social media messages

1 regarding Mr. Pompliano's dispute with Snapchat through its Twitter account in an
2 effort to further smear Mr. Pompliano.

3 13. Accordingly, Mr. Pompliano brings this lawsuit to clear his name, to
4 bring to the public eye Snapchat's dissemination to investors of false and misleading
5 material information, to seek protection from retaliation under state and federal
6 whistleblower laws, and to seek redress for the harm Snapchat has done to him and
7 his career, including damages for lost/back wages, significant harm to his
8 professional reputation, and punitive damages based on Snapchat' intentional,
9 wrongful, deceptive, retaliatory, and malicious conduct.

10
11 **PARTIES**

12 14. Mr. Pompliano is an individual who was working and residing in San
13 Francisco, California prior to his employment with Snapchat. Mr. Pompliano was
14 working and residing in Los Angeles, California during the time of his employment
15 with Snapchat. Mr. Pompliano currently is a citizen of North Carolina who works
16 and resides in North Carolina. Until the time of his wrongful termination, there
17 existed an employer-employee relationship and actual and implied employment
18 contracts between Mr. Pompliano and Snapchat.

19 15. Defendant Snap Inc. is a citizen of California. Defendant Snap Inc. is a
20 Delaware corporation that has its primary place of business in the County of Los
21 Angeles, California, and that its registered agent is Corporation Service Company,
22 dba Lawyers Incorporating Service, whose address is 2710 Gateway Oaks Dr., Suite
23 150N, Sacramento, California 95833.[1]

24 16. Defendants Evan Spiegel, Brian Theisen, and Imran Khan are citizens
25 of California. Mr. Pompliano is further informed and believes that at all times

26
27 [1] Defendant Snap Inc. was founded in 2011. Originally named "Snapchat Inc.," the
company rebranded itself as "Snap Inc." in 2016. The names "Snapchat," "Snapchat
28 Inc.," and "Snap Inc." are used interchangeably in this complaint.

1   relevant herein defendants Spiegel, Theisen, and Khan were individuals working
2   and/or residing in Los Angeles County, California, and were acting in the course
3   and scope of their employment as agents, managers, directors, and/or employees of
4   defendant Snap Inc.

5        17.    The true names and capacities of defendants referred to herein as Does
6   1 through 10 are unknown to Mr. Pompliano at this time and Mr. Pompliano is
7   informed and believes that they are also partly responsible for the damages he has
8   incurred. Mr. Pompliano will amend this complaint to allege their true names and
9   capacities when ascertained.

10        18.    Mr. Pompliano is informed and believes, and thereon alleges, that at all
11   material times each Doe defendant's actions and conduct were known to,
12   authorized, and ratified by Snapchat and its agents.

13        19.    Mr. Pompliano is informed and believes, and thereon alleges, that all
14   conduct by the individual defendants that was outside of the scope of their
15   authority was known to, authorized, and ratified by the co-defendants and Snap Inc.
16   and its agents. Mr. Pompliano is informed and believes that the individual
17   defendants conspired together in a manner intended to harm him, to cause him
18   emotional distress, and to deprive him of his employment and other benefits to
19   which he was entitled under the laws of the State of California.

20        20.    Mr. Pompliano is informed and thereon alleges that defendants
21   knowingly and willfully conspired and agreed among themselves to do the acts
22   herein alleged, and did those acts in furtherance of their conspiracy. Defendants
23   furthered their conspiracy by cooperation, lending aid, encouragement, ratification,
24   and adopting the acts of each other.

25        21.    Mr. Pompliano is informed and believes, and thereon alleges, that
26   defendants committed other wrongful acts or omissions of which Mr. Pompliano is
27   presently unaware. Such acts are ongoing and will continue after the filing of this
28   lawsuit. Mr. Pompliano expressly reserves the right to amend his complaint when he

1   discovers the other acts and omissions of such defendants and additional claims
2   against them.

3

4   **GENERAL ALLEGATIONS**

5   **Anthony Pompliano**

6       22.    Plaintiff Anthony Pompliano is a highly-decorated war veteran, and a
7   leading expert in the specialized field of developing and testing growth strategies for
8   social media Internet companies. His background amply prepared him for the
9   significant leadership roles that he has undertaken in recent years.

10       23.    Mr. Pompliano served his country for over six years in the United States
11   Army, where he rose to the rank of Sergeant. Mr. Pompliano graduated from the
12   Army's Warrior Leader Course as well as its Infantry Leadership School—courses
13   that focus on leadership, decision making, strategy, and ability to execute in
14   extremely high-stress situations. He was named Distinguished Leader Graduate and
15   Commandant's List Graduate, respectively—awards given only to the top 1% to 2%
16   of all graduates.

17       24.    In 2008, Mr. Pompliano deployed to Iraq to fight in Operation Iraqi
18   Freedom. During his 13-month deployment, he led his team in hundreds of combat
19   missions, including route clearance and high-value target cordon and searches. Mr.
20   Pompliano received numerous awards and medals for his service, including the
21   Combat Action Badge.

22       25.    Mr. Pompliano completed his bachelor's degree with a double major in
23   economics and sociology at Bucknell University in 2011, during which time he
24   played in Division I football.

25       26.    After graduation, Mr. Pompliano went on to co-found two successful
26   start-up companies, including a leading social intelligence company specializing in
27   demographic and psychometric measurement. Both companies were subsequently
28   acquired.

27.     Leveraging his experience building successful Internet startups, in February 2014, Mr. Pompliano was recruited to join Facebook, where he led the Growth & Engagement initiatives for Facebook Pages. While at Facebook, Mr. Pompliano helped to launch numerous products, including AMBER Alerts and Voter Registration, while also advising Facebook's top executives on their social media strategy. Mr. Pompliano was well-compensated at Facebook, receiving both a generous salary and significantly appreciating stock and stock options.

**Key Performance Metrics in the Social Media Industry**

28.     Virtually every social media application collects and analyzes data from the activity of user accounts in order to understand how users engage with the application. Certain user engagement metrics derived from such data have emerged as key indicators of an application's performance. Some examples of these key performance indicators ("KPIs") include an application's Daily Active Users, Monthly Active Users, User Retention Rate, Active User Growth Rate, Registration Completion Rate, Installations, Frequency, Session Length, and Average Revenue Per User.

29.     An application's Daily Active Users ("DAUs")—the total number of users who logged in on a given day—is widely viewed as one of the most important (if not the most important) KPIs in the industry. It is used, among other things, to measure an application's growth, rate of user retention, depth of user engagement, and to help create strategies for improving such core metrics, which is critical to success. It is therefore common for social media companies such as Facebook, Twitter, Snapchat, and others, to broadcast their DAUs publicly as a way to showcase their success.

30.     Given the importance of an application's DAUs and other KPIs, it is standard industry practice to employ sophisticated data analytics methods and testing to ensure the validity of KPIs and to develop intelligent strategic growth and

1  user engagement initiatives based on analyses of the numbers. For example,
2  Twitter's most recent annual report filed with the Securities and Exchange
3  Commission ("SEC") contains a section titled "Key Metrics," in which the company
4  states: "We review a number of metrics … to evaluate our business, measure our
5  performance, identify trends affecting our business, formulate business plans and
6  make strategic decisions." (Twitter, Inc., Annual Report (Form 10-K), at p. 4 (Feb.
7  27, 2017).)

8      31.    Facebook places similar importance on its "key metrics, which include
9  our daily active users," and explains the "inherent challenges in measuring usage of
10 our products," as well as the sophisticated methods it uses for testing such numbers.
11 (Facebook, Inc., Annual Report (Form 10-K), at p. 3 (Jan. 29, 2015); *see also id.* at p.
12 32.) Facebook further explains the critical importance of the accuracy of their
13 public disclosure of their KPIs as follows:

14          If marketers, developers, or investors do not perceive our user
15          metrics to be accurate representations of our user base, or if we
16          discover material inaccuracies in our user metrics, our reputation
17          may be harmed and marketers and developers may be less willing
18          to allocate their budgets or resources to Facebook, which could
19          negatively affect our business and financial results.

20 (*Id.* at pp. 20–21.)

21      32.    KPIs are so important, in fact, that even the slightest of shifts in the
22 numbers can carry devastating consequences. For example, in 2016, when Twitter
23 announced that its average monthly active users (MAUs) temporarily declined from
24 307 million to 305 million—a decrease of less than one percent—in the fourth
25 quarter of 2015, its stock price plummeted, notwithstanding the fact that Twitter
26 also announced a 48% increase in annual revenue. (*See* Forbes, *With Twitter Earnings,*
27 *User Base Weakness, But Better Ad Engagement Drives Earnings Beat* (Feb. 11, 2016),
28 available at http://www.forbes.com/sites/greatspeculations/2016/02/11/with-

twitter-earnings-user-base-weakness-but-better-ad-engagement-drives-earnings-beat/#36470ff38167.) Some of the news headlines covering Twitter's announcement are instructive:

- **"Twitter stock sinks as execs warn on user growth"** (*CNBC* (Feb. 10, 2016), *available at* http://www.cnbc.com/2015/07/28/twitter-earnings-7-cents-per-share-vs-expected-eps-of-4-cents.html)

- **"Twitter share price nosedives on news it is losing users"** (*The Guardian* (Feb. 10, 2016), *available at* http://www.theguardian.com/technology/2016/feb/10/twitter-share-price-falls-losing-users)

- **"Twitter is losing customers and its stock is falling"** (*CNN Money* (Feb. 10, 2016), *available at* http://money.cnn.com/2016/02/10/technology/twitter-stock-users/index.html)

- **"Twitter shares drop 11% on slowdown in user growth"** (*BBC* (Feb. 10, 2016), *available at* http://www.bbc.com/news/technology-27214815)

**Snapchat's Historic Failure to Employ Industry-Standard Internal Controls Concerning Its KPIs, and Its Purported Reversal of That Position When It Commits Itself to an IPO**

33.     Throughout its existence, Snapchat has relied heavily on its KPIs—especially its DAUs—externally to trumpet its growth in numerous disclosures to the public, to advertisers, and to investors. Internally, however—unlike mature social media companies such as Facebook and Twitter—Snapchat is reckless as to the calculation of its KPIs and has virtually no internal controls in place to verify their accuracy.

34.     To be sure, while it is widely viewed as basic common sense for social media companies to employ user growth and engagement teams to test their KPIs, evaluate their businesses, measure performance, identify trends, formulate business plans, and make strategic decisions, historically Snapchat hubristically refused to do so because Mr. Spiegel simply did not care about user engagement metrics. Unless, of course, it was in his financial interest to care: as discussed, when public- or capital-facing, Snapchat gladly trumpeted the numbers it did not care to diligence.

35.     This all changed after defendants decided to shift their focus to an IPO. Defendants realized that, to be taken seriously, they needed to be perceived as a mature organization. And because mature organizations in the social media space take their KPIs seriously, by mid-2015, Snapchat made it a top priority to hire a high-level executive to create and lead a new growth team at Snapchat.

36.     In the social media industry, there are only a handful of executives who possess the skill-set and experience required to design, implement, and run an effective growth and user engagement team. Mr. Pompliano is one of them. Accordingly, Snapchat began recruiting him aggressively.

**Defendants Aggressively Recruit Mr. Pompliano Away from Facebook to Lead Snapchat's New Growth Initiative by Making a Host of False Representations Concerning the Company's Growth; Believing These Misrepresentations, Mr. Pompliano Joins Snapchat**

37.     Snapchat recognized that hiring Mr. Pompliano would represent a twin coup, given the demonstrated talent he would bring to Snapchat and its new growth initiative, and the loss it would represent to Snapchat's industry rival, Facebook. Snapchat's top-ranking executives thus recruited him aggressively.

38.     In July 2015, Snapchat's in-house recruiter, Mary Mateus, arranged for Mr. Pompliano to meet with two of Snapchat's senior executives, Peter Sellis and Josh Siegel, telephonically. Following those meetings, Ms. Mateus informed Mr. Pompliano that Messrs. Sellis and Siegel had "loved" him, and she set up an

1   additional meeting with defendant Brian Theisen, Snapchat's Director of Business

2   Operations and a former Facebook employee. Mr. Pompliano again received

3   glowing feedback from Ms. Mateus.

4       39.    On Sunday, August 9, 2015, Snapchat flew Mr. Pompliano to Los

5   Angeles. The next day, Monday, August 10, 2015, he met with Snapchat's most

6   senior executives at Snapchat's headquarters in Venice, California. Among others, he

7   met with Snapchat's Chief Talent Officer, Simmi Singh, Snapchat's Director of

8   Product, Nick Bell, Snapchat's Director of Operations & Strategy, Steve Hwang, and

9   Snapchat's Chief Strategy Officer, defendant Imran Khan. Mr. Pompliano also had

10  an in-person follow-up meeting with Mr. Theisen. All of these executives gave Mr.

11  Pompliano a hard-sell and assured him that Snapchat was committed to

12  implementing a robust growth strategy and that their historic refusal to do so was a

13  thing of the past. To hammer that point home—which was particularly important

14  for Mr. Pompliano—they all repeated the same talking point: that Snapchat had

15  matured as an organization.

16      40.    Mr. Khan gave Mr. Pompliano a particularly hard-sell. Eager to convince

17  him to join Snapchat, Mr. Khan repeatedly trumpeted to Mr. Pompliano that

18  Snapchat was experiencing double-digit, month-over-month growth in its DAUs,

19  and further represented that the company was the fastest on record among social

20  media platforms to acquire 100 million DAUs. These representations were false, and

21  were typical for Mr. Khan, who made similar misrepresentations when he was

22  raising capital for Snapchat in the Asian markets, including in soliciting a $200

23  million investment from the Chinese ecommerce giant Alibaba Group Holding Ltd.

24      41.    Mr. Theisen echoed Mr. Khan's false representations concerning the

25  growth Snapchat represented in its DAUs.

26      42.    Mr. Pompliano flew back to Northern California at the end of the day.

27      43.    The very next day, Tuesday, August 11, 2015, Ms. Mateus called Mr.

28  Pompliano to inform him that Snapchat CEO Evan Spiegel would like him to fly

back down to Los Angeles the next day to meet with him. Mr. Pompliano explained that he had just flown down the day before, and that flying down for full day meetings twice in one week would be difficult because he would have to take an additional day off work without any notice. Ms. Mateus insisted it was urgent that he come back to meet with Mr. Spiegel. Because it was important to Mr. Pompliano to ascertain whether Mr. Spiegel was, in fact, committed to building a growth team, he agreed to fly back to Snapchat's offices the next day.

44.    On Wednesday, August 12, 2015, Mr. Pompliano flew back to Los Angeles. In addition to his scheduled meeting with Mr. Spiegel, Snapchat scheduled a number of meetings with other Snapchat executives, who, once again, gave Mr. Pompliano a hard sell on joining Snapchat. He met again separately with both defendants Messrs. Khan and Theisen, both of whom reiterated the same false measurements as before concerning Snapchat's growth—namely that Snapchat's active user base was growing at a double-digit rate month-over-month, and had already topped 100 million active users. Mr. Pompliano also met with Snapchat's Vice President of Engineering, Tim Sehn, who told him that if he joined Snapchat, Evan Spiegel would be very generous in awarding him stock options. Mr. Pompliano also met with Snapchat's Director of Engineering, Ilya Hankeson, and again with Mr. Theisen. Finally, Mr. Pompliano met privately with Snapchat's CEO, Evan Spiegel.

45.    Mr. Spiegel told Mr. Pompliano he liked that Mr. Pompliano had experience building Internet startups before his tenure at Facebook. Mr. Spiegel asked Mr. Pompliano if he could address any concerns he had with joining the company. Because his career hung in the balance, Mr. Pompliano inquired into Mr. Spiegel's commitment to building and supporting a growth team at Snapchat, and asked him to comment on Snapchat's failure to do so up to that point. Mr. Spiegel reiterated a talking point that Mr. Pompliano had heard from other Snapchat executives that Snapchat had matured as an organization; Mr. Spiegel confirmed that

Snapchat was fully committed to building a full-scale growth team around Mr. Pompliano, and asked Mr. Pompliano what he would need to build such a team. Mr. Pompliano painted a detailed picture of an organizational chart of a large-scale, fully-functioning growth team of about 40 people. Mr. Spiegel assured Mr. Pompliano that if he joined Snapchat, they would build such a team around him.

46.   Mr. Pompliano also explained his approach to growth-oriented testing, which involves creating and trying out several different tools or methods for attracting new users with several different user populations, and then comparing the respective success rates of each tool or method (familiarly known as "A/B testing"). Mr. Spiegel said his number one priority was growing Snapchat's user base and agreed that Snapchat should undertake A/B testing to identify the most effective means of doing so. Mr. Spiegel strongly urged Mr. Pompliano to join Snapchat.

47.   The very next morning, Thursday, August 13, 2015, Mr. Khan called Mr. Pompliano; he wanted to know what Mr. Pompliano was earning at Facebook, and what it would take to convince him to leave Facebook and join Snapchat. Mr. Pompliano relayed information concerning his current salary and stock options at Facebook, and Mr. Khan replied that this information was helpful and they would be in touch shortly.

48.   The next morning, on Friday, August 14, 2015, Mr. Theisen called Mr. Pompliano and offered him an annual salary of $225,000 and $3.5 million in Snapchat equity. Mr. Thieien said the offer was "massive," "unprecedented," and notably more generous than what most executive level employees at Snapchat received and urged him to accept it on the spot. Later that day, Mr. Pompliano counter offered for a salary of $250,000. Ms. Mateus responded that $240,000 was as high as Mr. Khan would go, and the parties agreed on that number, which Ms. Mateus said was the largest offer she had seen at Snapchat.

49.   Later the same day, Friday, August 14, 2015, Ms. Mateus emailed Mr. Pompliano his formal offer letter, along with a Confidential Information and

Inventions Assignment Agreement, and an Arbitration Agreement, as attachments. Copies of those three documents (as subsequently executed) are attached hereto as **Exhibits A**, **B**, and **C**, respectively. The letter offered Mr. Pompliano the position of Growth Lead, with an annual salary of $240,000, and an award of restricted stock units ("RSUs") with an aggregate value of $3,500,000, subject to approval by Snapchat's Board and a four-year vesting schedule.

50.     Both Ms. Mateus and Mr. Khan told Mr. Pompliano it was very important that he sign and return the three documents the same day and that he commence work at Snapchat the following Monday—i.e., resign his position with Facebook that day (a Friday) without giving any notice, uproot his life in Northern California, move to Los Angeles over the weekend, and start a new job on Monday, all in less than three days.

51.     Mr. Pompliano electronically signed and returned the three documents, and agreed that he could begin work in two weeks' time, to provide sufficient notice to his current employer, Facebook. Later, while employed at Snapchat, Mr. Pompliano received an email stating that the Board had approved and awarded to him the $3.5 million in Snapchat RSUs described in his employment agreement.

52.     Mr. Pompliano gave notice at Facebook the following Monday. This was a sensitive issue for Facebook, given the rivalry between the two companies and their respective founders, and Snapchat's pattern of luring away key Facebook employees. Accordingly, Mr. Pompliano's supervisor—the head of Facebook's growth and engagement team who reported directly to Facebook's CEO, Mark Zuckerberg—was disappointed about Mr. Pompliano's departure and would not agree to meet with him. Two days after Mr. Pompliano submitted his resignation he was instructed by Facebook's Human Resources department not to return to the premises and that his personal belongings would be cleared from his desk and mailed to him.

53.     News of Mr. Pompliano joining Snapchat was leaked to a news reporter at *TechCrunch*, a popular technology blog, who wrote an article on Mr. Pompliano's departure from Facebook to lead Snapchat's growth team. There was a media frenzy over the announcement in the days that followed; the story was picked up by the *Los Angeles Times*, as well as industry news sources including *The Drum, Learn Bonds*, and *CampaignLive*.

54.     When Mr. Pompliano joined Snapchat on August 31, 2015, however, everything changed. Behind the curtain was a very different company than the mature organization committed to building a growth team that he was sold by Snapchat's senior executives during the recruiting process.

**Mr. Pompliano Is Told by His Superiors That His Role Is Not What Was Promised, in Violation of the Express Terms of His Employment Agreement**

55.     For reasons not entirely clear to Mr. Pompliano—perhaps it was the media frenzy covering Mr. Pompliano's hire, which did not occur when Mr. Theisen joined the company, or Mr. Theisen's knowledge of Mr. Pompliano's salary—Mr. Theisen sought to marginalize Mr. Pompliano's role from the get-go.

56.     In particular, on Mr. Pompliano's third day at Snapchat, Mr. Theisen called Mr. Pompliano into his office (just after the *TechCrunch* article announced that Mr. Pompliano was to run Snapchat's Growth team) to admonish him, stating "you're not here to *run* the Growth Team, you're here to *work* on Growth." This notwithstanding every Snapchat executives' representations to the contrary and Mr. Pompliano's offer letter which stated his position was "Growth Lead."

57.     Two days later, Mr. Theisen announced that he was changing the name of his own department from "Business Operations" to "Growth & Revenue," in a transparent attempt to further marginalize Mr. Pompliano for no other reason than Mr. Theisen's insecurities.

**Snapchat Immediately Begins to Pressure Mr. Pompliano to Violate His Confidentiality and Non-Solicit Agreements**

58.     Throughout his shockingly brief, three-week tenure there, Snapchat repeatedly pressured Mr. Pompliano to divulge Facebook's confidential information in violation of contracts he signed with Facebook, about which Snapchat was well-aware, in no small part because Mr. Pompliano—a person whose standard of ethics would not bend to the significant pressure his new employer imposed on him—was placed in the tenuous position of having to remind Snapchat repeatedly.

59.     Mr. Khan met with Mr. Pompliano on September 4, 2015, and demanded that he draw a detailed organizational chart of Facebook, name the key employees, and identify which ones were particularly talented and could be poached by Snapchat. Mr. Pompliano explained that his confidentiality agreements with Facebook and his confidentiality agreement with Snapchat both barred him from revealing such information, and therefore provided only publicly-available information and declined to provide further details concerning Facebook's key employees. This frustrated Mr. Khan, who viewed Mr. Pompliano's ethics as betrayal.

60.     Similarly, on September 18, 2015, Mr. Pompliano was contacted by Snapchat's recruitment office, and asked if he would interview a candidate who currently worked at Facebook, with full knowledge that he was subject to a non-solicitation agreement with Facebook. In an email exchange, Mr. Pompliano declined, citing his non-compete and non-solicitation agreement with Facebook, which barred him from actively recruiting employees from his former employer. Mr. Pompliano was terminated by Snapchat within hours of this incident.

61.     Remarkably, Snapchat's misconduct was in violation of its own policies, which expressly represent to employees (including to Mr. Pompliano) in employment agreements:

You are being offered employment at Snapchat because of the personal skills and experience you have, not because of any

1      confidential, proprietary, for trade-secret information of a former

2      or current employer you may have. In your work for Snapchat, we

3      do not want you to use or disclose any such confidential,

4      proprietary, or trade-secret information.

5  (Ex. A at p. 2.) Mr. Pompliano learned the hard way that Snapchat's representation

6  was patently false.

7  **Mr. Pompliano Uncovers an Institutional Pandemic of Incompetence in Tracking and Calculating Key Performance Metrics Snapchat Was Disclosing to the Public and to Investors**

8

9      62.    On his second day, Mr. Pompliano met with his initial team members,

10  data analysts Jie Liu and Shizhang "Ben" Wu. Mr. Pompliano knew both of them as

11  former Facebook analysts. Messrs. Liu and Wu were happy that Mr. Pompliano had

12  joined Snapchat because they hoped his addition meant that Snapchat would begin

13  taking their data collection and analytics methods—or, more accurately, the lack

14  thereof—more seriously. They explained Snapchat's institutional aversion to

15  analyzing user data, and its utter incompetence in doing so in the off-chance

16  Snapchat did run basic testing, resulting in data sets that were completely unreliable.

17  For example, Snapchat ran a simple A/B test on a sign-up feature, and the test

18  resulted in no difference between the two groups. When the analysts reviewed the

19  results, however, they learned that there was actually an 8% difference, a statistically

20  significant finding. They walked Mr. Pompliano through a number of similar

21  examples of Snapchat's institutional incompetence with regard to its key data.

22      63.    The bleak picture painted by the two analysts caused Mr. Pompliano to

23  run tests to verify all of Snapchat's KPIs. As his first order of business, he sought to

24  obtain the current metrics concerning Snapchat's DAUs and its historical active user

25  growth rate, to establish benchmarks from which his success as the head of

26  Snapchat's new growth team would be measured going forward.

27      64.    What Mr. Pompliano learned from Messrs. Liu and Wu was shocking:

28  they explained that Snapchat had no method in place to measure its DAUs that was

1   close to accurate by industry standards. Rather, Snapchat crudely relied upon two

2   different figures being generated, using two different programs and data sets.

3   Neither was accurate. The first method used a program called Flurry, which was

4   based on external analytics and included in its count a variety of push notifications

5   (i.e., messages sent by Snapchat to users, which, if opened, would count as user

6   activity even if the user did nothing further) and led to overstated DAUs. The

7   second method used a program called Blizzard that was based on an internal data

8   pipeline and undercounted DAUs because it missed older users. Snapchat had no

9   way of knowing which of the two measurements, if either, was accurate. Instead of

10  trying to reconcile the internally competing data, and ensuring that they were relying

11  on accurate metrics, Snapchat merely picked numbers at random that they guessed

12  were accurate.

13      65.    Upon reviewing the results from each program, Mr. Pompliano was

14  surprised to see that even the exaggerated count generated by Flurry showed only 97

15  million DAUs and Blizzard showed only 95 million DAUs, less than the 100 million

16  DAUs defendants Theisen and Khan repeatedly claimed during the recruiting

17  process Snapchat had already achieved. In fact, the figures indicated that Snapchat's

18  inflation of DAUs went as far back as Q1 2015, when it first started touting the 100

19  million DAU figure. Mr. Pompliano's investigation revealed that at that time, the

20  actual DAUs were closer to 80 million. Concerned that Snapchat's management was

21  either misinformed or completely ignorant about key user engagement metrics it

22  was widely disseminating, Mr. Pompliano asked his team to obtain all of the

23  available data going back to January 1, 2015, to conduct further due diligence.

24      66.    The deeper Mr. Pompliano dug into the situation, the worse the

25  emerging picture became. Mr. Pompliano applied a variety of analytical tools to

26  rigorously measure DAUs at several points between January 1, 2015, and September

27  1, 2015. Once again, he was shocked to learn that Snapchat's purported double-digit

28  month-over-month DAU growth rate that Messrs. Theisen and Khan had

1  represented to him was false and grossly overstated. In fact, Snapchat's DAU growth

2  rate was often flat, or at times ranged from 1% to 4% per quarter during that nine-

3  month period, a far cry from double-digit month-over-month growth.

4      67.    Such glaring inaccuracies deeply concerned Mr. Pompliano—not only

5  because Snapchat's most senior executives were, at best, completely misinformed

6  about the company's most fundamental user growth and engagement metrics—but

7  also because, as a seasoned growth and engagement expert, he found it incredible

8  that a social media giant like Snapchat could use such crude data collection and

9  reporting methods. Accordingly, as any reasonable growth executive would have

10  done, Mr. Pompliano dug even deeper. What he uncovered was a wide-spread,

11  systemic failure in Snapchat's internal controls over its user data.

12      68.    Among the additional major inaccuracies Mr. Pompliano identified was

13  one having to do with another social media KPI: Snapchat's registration flow

14  completion rate. That is, the percentage of users who complete the Snapchat

15  registration process, compared to the number of users who only begin the

16  registration process. Mr. Pompliano learned that Mr. Spiegel and others on the

17  executive management team were representing that 87% of potential users

18  completed the registration process, when the data showed that the number was, in

19  fact, less than 40%.

20      69.    Mr. Pompliano also determined that another KPI used by Snapchat, its

21  user retention rate, was woefully inaccurate. The company had been representing

22  that it was losing around 60% of its users after 7 days, resulting in a roughly 40%

23  retention rate, when the data showed that its retention rate was, in fact, closer to

24  20%.

25      70.    It became clear to Mr. Pompliano that there were serious issues at every

26  level of the data stack. These issues included not only the final metrics, but also

27  serious deficiencies with how Snapchat's data tools and products were implemented,

28  monitored, and supported.

**Mr. Pompliano Presents His Findings to Defendants, Who View the Information Only as a Threat to Snapchat's IPO, So Instead of Taking Appropriate Curative Action, They Shoot the Messenger**

71.     Mr. Pompliano had seen hard copies of marketing brochures used to solicit advertisers that represented that Snapchat had over 100 million DAUs, and was therefore concerned that advertisers, investors, and others, were being misled. Accordingly, Mr. Pompliano contacted Jill Hazelbaker, Snapchat's Vice President of Communications, and informed her that the company should stop representing that it had over 100 million DAUs as this was not accurate. Ms. Hazelbaker told Mr. Pompliano that she was aware of the issue and had repeatedly raised it internally, but Snapchat ignored her.

72.     Mr. Pompliano also told defendant Khan about his findings concerning Snapchat's wildly inaccurate KPIs and explained the support he would need to turn things around. Mr. Khan feigned agreement, and said he would arrange a meeting with the CEO, Mr. Spiegel, so that Mr. Pompliano could present his findings.

73.     In anticipation of the meeting, Mr. Pompliano (with the assistance of Snapchat engineers, data analysts, and Mr. Theisen) began creating a PowerPoint presentation to interpret and summarize the results of his deep analytics applied to Snapchat's data, in order to give Snapchat's executive management team an accurate picture of Snapchat's true user metrics and to identify the errors he found in several of Snapchat's KPIs, including its DAUs, active user growth rate, user retention rate, and user registration completion rate.

74.     Given the importance of the presentation, Mr. Pompliano was exceedingly diligent in preparing it. He circulated drafts of his presentation to a number of analysts to confirm the underlying data and obtain their input. He also solicited the input of many other Snapchat executives to ensure he received their "buy-in," including from Messrs. Theisen and Khan, to whom he sent multiple drafts of the presentation prior to the meeting. Mr. Pompliano sent the presentation to the persons who were scheduled to attend the meeting where Mr. Pompliano

1  would present his findings: defendants Spiegel, Theisen, and Khan. Mr. Theisen

2  explicitly approved the final version of the presentation.

3       75.    The first page of the presentation (which contains handwritten notes

4  from one of the individual defendants) set the agenda:[2]

5

6

7

8

9

10

11

12

13

14

15

16

17

18



19  (Ex. D at p. 1.)

20       76.    Plaintiff's presentation to Snapchat identified the underlying problem in

21  clear terms: the data upon which Snapchat relied (and which it was disseminating to

22  advertisers and investors, among others) was "unreliable and inaccurate." In the

23  interests of preventing future harm to Snapchat, the presentation confronted

24  Snapchat's senior management with the undeniable truth that Snapchat's own data

25

26  [2] The entire presentation is attached to the complaint as **Exhibit D**. Although
   plaintiff does not believe that the presentation is subject to the parties' confidentiality

27  agreement, in light of the strong public interest in contents of the presentation in the
   context of plaintiff's whistleblower claims, Exhibit D is provisionally sealed in an

28  abundance of caution.

1  was internally contradictory, Snapchat was missing basic measurement tools, key

2  positions on Snapchat's growth team were still unfilled, and that "[f]ew people ha[d]

3  confidence in [Snapchat's] data":

## Room for Improvement

- Data is unreliable and inaccurate
  - Different pipelines report different numbers
  - Few people have confidence in the data
- Many basic tools are missing
  - Dashboards, testing frameworks, targeting tools, etc
- Key positions are unfilled
  - Very few experienced growth engineers
  - No current Growth Marketers
  - Understaffed data team

19  (Ex. D at p. 4.) The absence of a dashboard to track KPIs was a particularly

20  egregious shortcoming to Mr. Pompliano because in his experience, even the

21  smallest startups in the industry would have established this capability as one of

22  their first steps.

23      77.    And the presentation communicated to Snapchat a strategy for salvaging

24  the problem caused by its unreliable and inaccurate metrics, and the false

25  expectations that went along with disseminating those inaccuracies to the public as

26  if they were real. Although Snapchat executives were publicly boasting about their

27  growth, internally, Snapchat personnel were sounding the alarm that such growth

28  was unsustainable (and indeed, already slowing). In order to make good on its public

statements, Snapchat needed to dramatically accelerate its growth (the job that Mr. Pompliano had been lured away from Facebook to accomplish for Snapchat):



(Ex. D at p. 19.)

78.    On September 11, 2015, Mr. Pompliano met with defendants Spiegel, Theisen, and Khan to present his findings. It was clear that defendants had no interest in hearing the information Mr. Pompliano presented. In fact, Mr. Spiegel was inexplicably enraged throughout the meeting and refused to listen to anything Mr. Pompliano said, constantly cutting him off and summarily dismissing his points. By way of example:

        a.    Mr. Spiegel began flipping through the presentation and skipped over its most important sections. Mr. Pompliano asked if he had read those slides, as they contained vital business intelligence and data. Mr. Spiegel responded dismissively, "Yeah, I read those; it doesn't matter," and further stated that Mr. Pompliano was wasting his time. Mr. Pompliano explained that he and Snapchat's analysts had examined the data carefully, and the results were

1  accurate and not susceptible to any other interpretation. Everyone who had

2  reviewed the presentation while it was being prepared, including Snapchat data

3  analysts, engineers, and defendant Theisen, had signed off on its contents.

4  Facts are facts; but defendants—especially Mr. Spiegel—stubbornly refused to

5  hear them.

6          b.     Mr. Pompliano raised the serious issue of Snapchat's misreported

7  DAUs. Again, Mr. Spiegel would hear nothing of it; he told Mr. Pompliano it

8  was "no big deal" that Snapchat's public statements that it had over 100 million

9  DAUs were false. Mr. Pompliano disagreed, stating, "it's actually a very big

10  deal."

11          c.     Mr. Pompliano also identified several proven strategies to grow

12  Snapchat's user base that Snapchat was not utilizing. Mr. Spiegel again spurned

13  him. For example, the data showed that Snapchat's international user metrics

14  were very low, even in countries with high-levels of social media engagement,

15  such as Spain and India. When Mr. Pompliano attempted to explain that he

16  could implement strategies to achieve significant growth for Snapchat in these

17  major markets, Mr. Spiegel abruptly cut in and said, "This app is only for rich

18  people. I don't want to expand into poor countries like India and Spain." Mr.

19  Spiegel would not entertain any further discussion on the matter.

20  In spite of Mr. Spiegel's hyperbolic reaction, many of Mr. Pompliano's

21  recommendations miraculously found their way into Snap's 2016 S-1 SEC filing, a

22  year and a half after his termination from the company.

23          79.    Mr. Spiegel abruptly ended the meeting by instructing Messrs. Khan and

24  Theisen to "fix the problem" and then he stormed out of the room. On

25  information and belief, defendants Spiegel, Khan, and Theisen subsequently met in

26  private where they decided that Mr. Pompliano presented a risk to Snapchat's IPO.

27  In particular, unlike Messrs. Khan and Theisen, Mr. Pompliano was not going to be

28  a yes-man to Mr. Spiegel when that meant turning a blind eye to the facts and

1    making false representations concerning Snapchat's growth and value. Moreover,

2    defendants became concerned that Mr. Pompliano would "blow the whistle" on

3    Snapchat if they did not take corrective action, which they had no intention of

4    doing. Accordingly, Mr. Spiegel instructed Messrs. Khan and Theisen to get rid of

5    Mr. Pompliano.

6         80.    It became painfully clear at the meeting—a mere two weeks in to Mr.

7    Pompliano's tenure at Snapchat—that Snapchat's most senior executives, in

8    particular, defendants Spiegel, Theisen, and Khan, saw the information Mr.

9    Pompliano brought to their attention (with the full backing of Snap's growth and

10   data teams) only as a threat to Snapchat's imminent IPO, and they had no interest in

11   taking any of the reasonable measures he proposed to ensure the accuracy of

12   Snapchat's KPIs and public disclosures.

13        81.    Given defendants' contumacy, during the week of September 14, 2015,

14   Mr. Pompliano emailed Mr. Theisen, stating that Snapchat had to stop

15   misrepresenting its user metrics, as they were misleading the public. He further

16   stated that he had been doing this long enough to know that if Snapchat continues

17   misrepresenting its KPIs it will come back to bite them. Mr. Theisen responded that

18   he agreed that they needed to address this issue.

19        82.    The same week, Mr. Pompliano spoke with Snapchat's Vice President of

20   Finance and acting Chief Financial Officer, Drew Vollero. Mr. Vollero said he

21   understood that growth was the key to Snapchat's success, in particular because it

22   was laying the groundwork for an initial public offering, and told Mr. Pompliano

23   that he was therefore the person responsible for their future. Mr. Vollero also told

24   Mr. Pompliano that he understood that the metrics Snapchat had been using were

25   wrong, and therefore their representations were inaccurate and should be corrected.

26        83.    In response to Mr. Spiegel's directive at the September 11 meeting to

27   "fix the problem," Messrs. Theisen and Khan instructed Mr. Pompliano to prepare a

28   further PowerPoint presentation purportedly to address many specific questions

1   around "friending" data that Mr. Spiegel had asked at the September 11 meeting. As

2   explained below, in reality, the request for a presentation was a set-up—a

3   contrivance that allowed Snapchat to manufacture a basis to terminate Mr.

4   Pompliano.

5       84.    In response to the directive from his superiors, Mr. Pompliano (working

6   with Snapchat's growth and data teams) began creating a second presentation that

7   provided a constructive critique of Snapchat's metrics, proposed solutions to the

8   problems, including better and more accurate ways to track and analyze available

9   data, and addressed Mr. Spiegel's questions concerning "friending" data. Once again,

10  Mr. Pompliano circulated a draft of the presentation to analysts Ben Wu and Jie Liu,

11  as well as Director of Engineering Ilya Henkesen, Mr. Theisen and Vice President

12  of Engineering Tim Sehn, for their input. Mr. Theisen, among others, signed off on

13  the presentation.

14      85.    Mr. Pompliano emailed the final draft to Messrs. Spiegel, Theisen, and

15  Khan, on or about September 17, 2015. Mr. Theisen sent back to Mr. Pompliano a

16  summary of Mr. Spiegel's criticism after Mr. Spiegel reviewed the PowerPoint

17  presentation. Once again, it was clear that Mr. Spiegel did not take well to the data

18  that Mr. Pompliano presented concerning Snapchat's faulty measurement methods.

19  In reality, Mr. Spiegel's critique, which was was crude and misguided, was done solely

20  to manufacture a basis to terminate Mr. Pompliano. Accordingly, Mr. Pompliano

21  responded to the critique in a document circulated to, among others, Mr. Theisen, in

22  which he systematically dismantled Mr. Spiegel's misguided criticism.

23      86.    On September 18, 2015, defendant Theisen sent Mr. Pompliano a

24  seemingly innocuous invitation to a meeting for the ostensible, but ultimately false,

25  purpose of having a "growth sync" discussion with Mr. Theisen. When he arrived at

26  the meeting, however, Snapchat's new head of Talent and Human Resources, Stacie

27  Thomas, was in attendance. Ms. Thomas had replaced Simmi Singh, who had been

28  terminated only the week before.

87.     As it turned out, the purpose of the meeting was far more nefarious than Mr. Theisen's seemingly innocuous email suggested. Mr. Theisen appeared highly stressed and was stumbling over his words; he began by explaining that Mr. Pompliano's "style" and "approach" were different than others at Snapchat, in particular Evan Spiegel, and then simply said, "so we are going to have to let you go." Mr. Theisen asked Mr. Pompliano if he had any questions. Shocked, Mr. Pompliano asked why he was being terminated, and Mr. Theisen, was only able to mumble that the directive came from the top, that "it was Evan."

88.     Mr. Theisen left, and shortly thereafter a security guard arrived with a box with Mr. Pompliano's personal items, while his smart phone was wiped of any Snapchat accounts and data. Mr. Pompliano was then escorted from Snapchat's premises. He was terminated a mere three weeks into his tenure as a Snapchat employee for, at best, uncovering ignorance, or, at worst, revealing systematic fraud.

**Defendants' Efforts to Discredit Mr. Pompliano and Destroy his Career, and the Need for Immediate Injunctive Relief**

89.     As a result of his abrupt and wrongful termination by Snapchat, Mr. Pompliano has been deprived of his position as Growth Lead, his annual salary of $240,000, and his Snapchat stock, the present value of which is estimated to be in excess of $5 million. Mr. Pompliano's wrongful termination by Snapchat has also caused serious and irreparable damage to his professional reputation in his rarefied field of work, and significant emotional distress. Mr. Pompliano's hiring based on false representations and abrupt termination by Snapchat also caused him to lose his valuable position, good reputation, salary and significant stock options at Facebook, none of which can be restored to him.

90.     Simply terminating Mr. Pompliano wasn't enough for defendants, however. To ensure that the widespread incompetence and false representations that Mr. Pompliano uncovered at Snapchat did not get in the way of its IPO, defendants took preemptive measures to discredit Mr. Pompliano. In particular, defendants

falsely represented to Snapchat employees and to third parties, including high-ranking executives in the social media industry, that Mr. Pompliano was terminated three weeks after he was hired because he was incompetent. In reality, however, Mr. Pompliano was terminated because he refused to participate in a scheme to deceive the public and artificially inflate Snapchat's valuation in anticipation of its IPO.

91.    For example, Mr. Pompliano was in talks with a major social media company about a filling a senior executive role with the company. The discussions had advanced considerably and Mr. Pompliano had received glowing feedback and enthusiasm about his prospective role with the company. On a near daily basis, Mr. Pompliano was communicating with a number of the company's top executives, all of whom would promptly respond to Mr. Pompliano's inquiries.

92.    The company, however, abruptly cut off all communications with Mr. Pompliano—notwithstanding its enthusiasm about Mr. Pompliano's candidacy—soon after it contacted Snapchat to inquire into Mr. Pompliano's short tenure there. Because Snapchat would not jeopardize its IPO, defendants falsely claimed that Mr. Pompliano was terminated because he was incompetent, notwithstanding the fact that he had been employed by Snapchat for a mere three weeks and had not received a single negative review.

93.    Defendants have made similar false representations about Mr. Pompliano to Snapchat's own employees.

94.    These false representations have severely damaged Mr. Pompliano's reputation and career prospects. He therefore seeks an injunction preventing defendants from doing any further damage to his reputation and career during the pendency of this litigation.

95.    Defendants have been falsely representing and continue to falsely represent to a wide-range of entities and leaders in the social media industry that they terminated plaintiff's employment a mere three weeks after he was hired because he was not adequately performing in his position at Snapchat. Such

1 representations were false and malicious and made for the purpose of covering up

2 Snapchat's false representations to investors and to the public.

### FIRST CAUSE OF ACTION

### (VIOLATION OF DODD-FRANK WHISTLEBLOWER

### STATUTE; AGAINST ALL DEFENDANTS)

6 96.     Plaintiff incorporates by reference and realleges each allegation set forth

7 above.

8 97.     15 U.S.C. § 78u-6 ("Section 922") provides that no employer may

9 discharge a whistleblower because of any lawful act done by the whistleblower in

10 making disclosures that are required or protected under the Sarbanes–Oxley Act of

11 2002 (15 U.S.C. 7201, *et seq.*), the Securities Exchange Act of 1934 (15 U.S.C. 78a, *et*

12 *seq.*), section 1513(e) of title 18, United States Code, and any other law, rule, or

13 regulation subject to the jurisdiction of the Securities and Exchange Commission

14 ("SEC"). Dodd-Frank Act, § 922(a); 15 U.S.C.A. § 78u-6(h)(1)(A) (2010).

15 98.     Section 922 protections apply not only to whistleblowers who make

16 disclosures to the SEC, but also to individuals who make internal disclosures. *Somers*

17 *v. Digital Realty Trust Inc. v. Digital Realty Trust Inc.*, 850 F.3d 1045, 1047 (9th Cir.

18 2017).

19 99.     Reporting an actual violation is not required to qualify as protected

20 activity; a whistleblower engages in protected activity by reporting a belief of a

21 violation that is about to occur or is in the stages of occurring. *Barrett v. e-Smart*

22 *Technologies, Inc.*, ARB Nos. 11-088, 12-013, ALJ No. 2010-SOX-31 (ARB Apr. 25,

23 2013); *see also Leshinsky v. Telvent GIT, S.A.*, No. 10-cv-4511, 2013 WL 1811877, at

24 *10 (S.D.N.Y. May 1, 2013) (finding "imminent crimes, or at least crimes in their

25 infancy" are within the scope of protected activity because it "furthers the purpose

26 of Section 806 to nip corporate wrongdoing in the bud, rather than permitting a

27 scheme to blossom into a full-fledged crime before whistleblower protections take

28 effect").

100.    A whistleblower is protected under these provisions if he or she possesses a reasonable belief that the information being provided relates to a possible securities law violation or a possible violation under the Sarbanes–Oxley Act that has occurred, is ongoing, or is about to occur. 17 C.F.R. § 240.21F-2(b)(*i*).

101.    Section 922 incorporates 18 U.S.C. § 1513(e), which prohibits "interference with the lawful employment or livelihood of any person" who provides truthful information "to a law enforcement officer" relating to the commission of federal offenses.

102.    Plaintiff reasonably believed that by disseminating to investors, advertisers, and others, false and misleading material information relating to Snapchat's KPIs, and doing so in connection with Snapchat's upcoming IPO, defendants were knowingly engaging in material misrepresentations and omissions, in connection with the sale of a security, and failing to make disclosures required by the Sarbanes–Oxley Act. Accordingly, plaintiff reasonably believed that defendants were committing possible securities law violations and disclosure and other violations covered by the Sarbanes–Oxley Act and other federal laws.

103.    Plaintiff reported information to his superiors concerning defendants' potential violation of Section 10(b) of the Exchange Act and the Sarbanes–Oxley Act.

104.    Plaintiff expected the information he provided to his superiors would be conveyed to Snapchat's attorneys, who would, if the allegations were substantiated, provide the information to either the SEC or other law enforcement officials.

105.    Consequently, plaintiff was providing information that Snap Inc. was violating Section 10(b) of the Exchange Act and the Sarbanes–Oxley Act.

106.    Plaintiff explained defendants' violations in detail to his superiors.

107.    Prior to the date plaintiff was terminated from Snapchat, defendants learned that plaintiff had engaged in this protected activity.

1    108.   On September 18, 2015, defendants terminated plaintiff's employment

2    with Snapchat because plaintiff had engaged in this protected activity.

3    109.   As a result of defendants' violation of Section 922, plaintiff has been

4    injured in an amount to be determined at trial but believed to be not less than $10

5    million.

## SECOND CAUSE OF ACTION

## (VIOLATION OF CALIFORNIA'S WHISTLEBLOWER PROTECTION STATUTE; AGAINST ALL DEFENDANTS)

9    110.   Plaintiff incorporates by reference and realleges each allegation set forth

10   above.

11   111.   Plaintiff alleges that his termination was wrongful because it was in

12   violation of the public policy of the United States in that plaintiff's termination was

13   in retaliation for plaintiff's opposing and reporting illegal activity, as described in

14   preceding allegations.

15   112.   Plaintiff further alleges that defendant's termination of plaintiff was in

16   violation of the Sarbanes–Oxley Act of 2002, which makes it illegal to fire or

17   otherwise discriminate against an employee for providing information of a violation

18   of a rule of the Securities and Exchange Commission or any provision of federal

19   law relating to fraud against shareholders, 18 U.S.C. § 1514A(a)(1), including when

20   the employee provides information or assistance to someone with "supervisory

21   authority over the employee" or with authority to "investigate, discover, or terminate

22   misconduct," as plaintiff did.

23   113.   Plaintiff further alleges that defendants' termination of plaintiff was in

24   violation of the public policy as expressed in California Labor Code § 1102.5

25   prohibiting retaliation for reporting violations or potential violations of a state or

26   federal law or regulation, or local, state or federal rule or regulation.

27   114.   As a direct, foreseeable, and proximate result of defendants' wrongful

28   termination of plaintiff in violation of the public policy of the State of California,

1   plaintiff has lost and will continue to lose income and benefits, and has suffered and

2   continues to suffer humiliation, embarrassment, mental and emotional distress, and

3   discomfort all to plaintiff's damage, in excess of $10 million, plus benefits and stock

4   options, the precise amount of which will be proven at trial.

5       115.   Because the acts taken against plaintiff were carried out by, condoned by,

6   and ratified by managerial employees or managing agents acting in a deliberate, cold,

7   callous, malicious, oppressive, and intentional manner in order to injure and damage

8   plaintiff, plaintiff requests the assessment of punitive damages against defendant in

9   an amount appropriate to punish and make an example of defendant.

10                          **THIRD CAUSE OF ACTION**

11              **(WRONGFUL TERMINATION IN VIOLATION OF**

12                 **PUBLIC POLICY; AGAINST ALL DEFENDANTS)**

13      116.   Plaintiff incorporates by reference and realleges each allegation set forth

14   above.

15      117.   Defendants terminated plaintiff's employment in violation of

16   fundamental public policies of the State of California, as reflected in its laws,

17   objectives and policies, in retaliation for identifying, reporting, and being perceived

18   by defendants to be threatening to report material false representations and

19   wrongdoings by Snapchat, Spiegel, Theisen, Khan and/or by Does 1 through 10,

20   and their agents, which adversely affected the public and third parties, including but

21   not limited to advertisers, prospective employees and, on information and belief,

22   private investors. Said policies are stated in the Labor Code, the California

23   Constitution, the common law, federal securities fraud statutes, and in other civil and

24   criminal statutes, including but not limited to those proscribing theft (Cal. Pen. Code

25   §§ 484, 487), fraud (Cal. Civ. Code §§ 1572, 1709), false advertising (Cal. Bus. &

26   Prof. Code § 17500, *et seq.*), and securities fraud (Section 17(a) of the Securities Act,

27   Section 10(b) of the Exchange Act, and Rule 10b-5). The conduct that violated said

28

1   policies is stated *supra* in this Complaint at Paragraphs 40 to 84, and summarized

2   below.

3       118.   After joining Snapchat, plaintiff learned that representations of

4   defendants Theisen and Khan—including but not limited to the representations that

5   Snapchat was experiencing double-digit month-over-month growth in its DAUs, and

6   that the company had acquired 100 million DAUs, and was the fastest on record

7   among social media platforms to do so—were false. Plaintiff also learned that

8   Snapchat was falsely representing its registration flow completion rate (the

9   percentage of persons who complete the process of registering as a Snapchat user,

10  compared to the number of persons who begin the registration process) as being

11  87%, when in fact the data showed that less than 40% of potential users completed

12  the registration process. Further, plaintiff learned that the user retention rate used

13  by Snapchat was false—that is, the company was representing that it was losing

14  about 60% of users after 7 days, resulting in a roughly 40% retention rate, whereas

15  in fact its retention rate was closer to 20% after 7 days.

16      119.   Because some of these false representations had been made to the

17  public, prospective employees, advertisers and, on information and belief, to

18  investors, plaintiff repeatedly urged defendants Spiegel, Theisen, Khan, and others

19  to cease making such false representations and affirmatively correct them.

20      120.   Defendants Snap Inc. and Khan also improperly pressured plaintiff to

21  divulge Facebook's confidential information, and to assist them in identifying and

22  soliciting Facebook's key employees in breach of his agreements with Facebook, as

23  described in Paragraphs 55 to 61 above, which plaintiff refused to do.

24      121.   Defendants Spiegel, Theisen, and Khan perceived that plaintiff would

25  report Snapchat's false representations to the federal securities regulators, other

26  governmental authorities, or in some other manner expose the Company's

27  misconduct if Snapchat continued to misrepresent its user metrics to the public,

28  prospective employees, advertisers and private investors and failed to correct its

prior misrepresentations. For these reasons, and because plaintiff refused to unlawfully disclose Facebook's confidential information or solicit Facebook employees, defendants retaliated against plaintiff by summarily and wrongfully terminating his employment in violation of public policy.

122.    As a result of their employment relationship, defendants Snap Inc., Spiegel, Theisen, Khan, and Does 1 through 10, and their agents and employees, were obligated to refrain from discharging plaintiff for reasons which violate or circumvent the public policies and laws of the State of California and United States, or the objectives that underlie each, and not to compound their illegal conduct by retaliating against him.

123.    As the direct and foreseeable result of the acts of defendants Snap Inc., Spiegel, Theisen, Khan, Does 1 through 10, and their agents and employees, plaintiff lost his valuable position and income as Growth Lead, his Snapchat RSUs, and will continue to lose income in an amount to be proven at trial. Plaintiff has also incurred attorneys' fees. Plaintiff claims such amounts as damages together with pre-judgment interest pursuant to California Civil Code § 3288 and any other provision of law providing for pre-judgment interest.

124.    As a result of the acts of defendants Snap Inc., Spiegel, Theisen, Khan, Does 1 through 10, and their agents and employees, plaintiff has become mentally and physically upset, distressed, and aggravated. Plaintiff claims general damages for such physical and emotional distress and aggravation in a sum to be proven at trial.

125.    Because the acts taken toward plaintiff by defendants Snap Inc., Spiegel, Theisen, Khan, Does 1 through 10, and their agents and employees, were done in a deliberate, cold, callous, malicious, fraudulent and intentional manner in order to injure and damage plaintiff, defendants Snapchat, Spiegel, Theisen, Khan and Does 1 through 10, and their agents and employees acted in conscious disregard of plaintiff and his rights, and such acts were oppressive and despicable. Accordingly,

1  plaintiff requests an assessment of punitive damages against defendants in an
2  amount to be proven at trial.

**FOURTH CAUSE OF ACTION**

**(FRAUDULENT INDUCMENT OF EMPLOYMENT**

**CONTRACT; AGAINST ALL DEFENDANTS)**

6      126.    Plaintiff incorporates by reference and realleges each allegation set forth
7  above.

8      127.    Plaintiff is informed and believes and thereon alleges that, at all times
9  herein mentioned, defendants Spiegel, Theisen, Khan, and Does 1 through 10 were
10 the agents and employees of defendant Snap Inc. and were at all times acting within
11 the purpose and scope of such agency and employment.

12     128.    Defendants Snap Inc., Spiegel, Theisen, and Khan intentionally
13 misrepresented to plaintiff that Snapchat was experiencing double-digit month-
14 over-month growth in its DAU count, that Snapchat had acquired over 100 million
15 DAUs, that he would be hired and retained by Snapchat as its Growth Lead, and
16 that Snapchat would build around him a growth team of forty persons.

17     129.    All of defendants' representations set forth in Paragraph 118 above
18 concerning the kind and character of employment offered to plaintiff were false,
19 and defendants knew that those representations were false when they made them, or
20 that they made the representations recklessly and without regard for their truth, in
21 order to induce plaintiff to resign from Facebook and relocate from the Bay Area to
22 Los Angeles to work for Snapchat.

23     130.    Defendants intended that plaintiff rely on the false representations set
24 forth in Paragraph 118.

25     131.    Plaintiff reasonably relied on defendants' representations set forth in
26 Paragraph 118 above, which were material to his decision to resign his position at
27 Facebook, relocate from the Bay Area to Los Angeles to join Snapchat, and was
28 harmed as a result, including by losing his lucrative and prestigious position of

employment with Facebook, valuable stock options awarded to him by Facebook, injury to his professional reputation, relocation expenses, and other damages to be proven at trial and doubled pursuant to Labor Code Section 972.

132.    Defendants' false representations and plaintiff's reasonable reliance thereon were a substantial factor in causing plaintiff harm.

## FIFTH CAUSE OF ACTION
## (BREACH OF CONTRACT; AGAINST DEFENDANT SNAP INC.)

133.    Plaintiff incorporates by reference and realleges each allegation set forth above.

134.    Plaintiff and defendant Snap Inc. entered into a contract whereby Snap Inc. agreed to and did hire plaintiff as Growth Lead at Snapchat at a salary of $240,000 per year plus $3.5 million in restricted stock units as valued in September 2015 and to be vested over a period of four years of his employment at Snapchat.

135.    Plaintiff did all of the material things that the contract required him to do, or was excused from doing those things, and the conditions required for the performance of defendants occurred.

136.    Defendants breached plaintiff's employment agreement by urging him to violate his confidentiality and non-solicitation agreements with Facebook and retaliating against him when he refused to do so. Defendant Snap Inc. also breached plaintiff's employment agreement by demoting him from his position as Growth Lead, and wrongfully terminating his employment after less than three weeks, for improper and illegal reasons in violation of public policy. Having wrongfully terminated plaintiff's employment in violation of public policy, defendant Snap Inc. lost any right to terminate him "at any time, with or without cause or advance notice."

137.    Plaintiff was harmed by defendants' breaches described in paragraph 126 herein, and is entitled to direct and consequential damages in an amount to be

1  proven at trial, including, but not limited to, his salary of $240,000 per year for a

2  period of four years, and his Snapchat RSUs, the present value of which is

3  estimated to be in excess of $5 million, that was awarded to him pursuant to his

4  employment contract with Snap Inc.

## SIXTH CAUSE OF ACTION

## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; AGAINST DEFENDANTS SNAP INC. AND DOES 1 THROUGH 10)

9      138.  Plaintiff incorporates by reference and realleges each allegation set forth

10  above.

11      139.  Plaintiff is informed and believes and thereon alleges that, at all times

12  herein mentioned, defendants Spiegel, Theisen, and Khan were the agents and

13  employees of defendant Snap Inc. and were at all times acting within the purpose

14  and scope of such agency and employment.

15      140.  California law implies a covenant of good faith and fair dealing in all

16  contracts between parties entered into in the State of California. Defendants at all

17  material times had a duty to act fairly and in good faith toward plaintiff in carrying

18  out their responsibilities under his employment agreement with Snap Inc. The

19  implied covenant of good faith and fair dealing further constituted promises and

20  obligations on the part of defendants that they would do nothing to injure, frustrate

21  or interfere with the rights of plaintiff under his Snapchat employment agreement,

22  or engage in any act or omission that was intended to or had the natural tendency to

23  deprive plaintiff of the benefits of that bargain.

24      141.  As a result of the actions of defendants Snap Inc., Spiegel, Theisen,

25  Khan, and each of them, set forth hereinabove, defendants have breached the

26  implied covenant of good faith and fair dealing contained in plaintiff's employment

27  contract as against him, and as a result thereof, plaintiff is entitled to damages.

28

142.   The actions of defendants in wrongfully terminating plaintiff's employment for illegal and improper reasons in retaliation for his refusal to breach confidentiality agreements with his prior employer, and for his identifying false and misleading representations of Snapchat, as hereinbefore described, violated the implied covenant of good faith and fair dealing in plaintiff's employment contract.

143.   As a direct and proximate result of defendants' bad faith, plaintiff has suffered general damages, *inter alia*, (a) in the amount of his $240,000 annual salary for a period of four years; (b) the Snap Inc. stock awarded to him, the present value of which is estimated to be in excess of $5 million; (c) his lost position, income, and stock options at Facebook; (d) substantial harm to his professional reputation; (e) the interest that has accumulated or will accrue on top of those amounts; (f) other damages defendants' breach of the covenant caused plaintiff to suffer in the amounts to be proven at trial.

## SEVENTH CAUSE OF ACTION
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; AGAINST ALL DEFENDANTS)

144.   Plaintiff incorporates by reference and realleges each allegation set forth above.

145.   When defendants Snap Inc., Spiegel, Theisen, Khan, Does 1 through 10, and their agents and employees, lured plaintiff to leave his former employment with Facebook to come work for Snapchat based on false representations concerning Snapchat's growth, with the purpose to cause him to breach his confidentiality agreements with his prior employer, Facebook, and then summarily terminated his employment only weeks later for improper and illegal reasons set forth above, they did so deliberately and intentionally to cause plaintiff to suffer humiliation, mental anguish, physical harm, loss of his job and income, damage to his professional reputation and the foreseeable emotional distress that resulted, or in the alternative

1    acted with reckless disregard of the probability that plaintiff would suffer such

2    emotional distress.

3        146.   The outrageousness of defendants' conduct is amplified by the abuse of

4    their positions, which gave them actual and apparent authority over plaintiff, such as

5    is commonly found in employment relationships. Defendants Snap Inc., Spiegel,

6    Theisen, Khan, Does 1 through 10, and their agents and employees were aware that

7    plaintiff was relying upon his employment at Snapchat when he resigned from

8    Facebook. Defendants Snap Inc., Spiegel, Theisen, Khan, and Does 1 through 10,

9    and their agents and employees were aware that abruptly and illegally terminating

10   plaintiff's employment in the manner in which they did, and by retaliating against

11   him, would cause plaintiff to suffer extreme emotional distress, and other

12   consequential damages. Plaintiff alleges that defendants not only acted as individuals

13   but conspired together so as to cause him to suffer these harms.

14       147.   In acting as described above, and in abusing their positions of apparent

15   and actual authority over plaintiff, defendants Snap Inc., Spiegel, Theisen, Khan,

16   Does 1 through 10, and their agents and employees, abandoned their proper roles as

17   employers and used their positions or authority to cause plaintiff to suffer

18   emotional distress.

19       148.   The above acts of defendants Snap Inc., Spiegel, Theisen, Khan, Does 1

20   through 10, and their agents and employees, inclusive, constituted intentional

21   infliction of emotional distress and such conduct of defendants was a substantial

22   and determining factor in causing damage and injury to plaintiff.

23       149.   As a proximate consequence of the wrongful acts against plaintiff by

24   defendants Snap Inc., Spiegel, Theisen, Khan, Does 1 through 10, and their agents

25   and employees, plaintiff has suffered lost earnings, emotional distress, and other

26   general and special damages, to be proven at trial.

27       150.   The actions of defendants Snap Inc., Spiegel, Theisen, Khan, Does 1

28   through 10, and their agents and employees, were willful, reckless and exhibited a

1  conscious disregard of the rights of plaintiff. Accordingly, plaintiff is entitled to

2  punitive damages, in an amount to be proven at trial.

3  EIGHT CAUSE OF ACTION

4  (VIOLATION OF CALIFORNIA LABOR CODE § 201, *ET*

5  *SEQ.*; AGAINST DEFENDANT SNAP INC.)

6  151.   Plaintiff incorporates by reference and realleges each allegation set forth

7  above.

8  152.   An employer who willfully fails to pay fully, unconditionally, and without

9  requiring a release, any and all wages due an employee immediately upon his

10 termination by the employer, may be assessed continuing wages as a penalty from

11 the date the wages were due up to a maximum of 30 days. Cal. Labor Code §§ 201,

12 203, 206.

13 153.   On or about October 2, 2015, ten days after his wrongful termination,

14 plaintiff received a check from Snapchat in the approximate amount of $6,000,

15 purporting to comprise his final paycheck (minus taxes) and also reflecting on the

16 attached stub a further payment of approximately $60,000 (pre-tax) as a severance

17 payment.

18 154.   Plaintiff did not accept the terms of severance proposed by defendant

19 Snap Inc. or agree to the release of all claims against the company as was required as

20 a condition of the proposed severance payment. Accordingly, plaintiff did not cash

21 the check that was attached to a pay stub inaccurately reflecting the proposed

22 severance payment, lest doing so be construed as acceding to the conditions and

23 release connected to that severance payment.

24 155.   Defendant Snap Inc. was required to provide plaintiff with his final

25 paycheck unconditionally on September 22, 2015, the day he was terminated, but

26 failed to do so. As a result of that failure, Snapchat is required by operation of

27 California Labor Code § 201 to pay Mr. Pompliano $30,000, comprising 30 days'

28

salary ($20,000) and his final paycheck ($10,000), less any withholding of mandatory taxes.

## NINTH CAUSE OF ACTION
## (MISREPRESENTATION PREVENTING FORMER EMPLOYEE FROM OBTAINING EMPLOYMENT; AGAINST ALL DEFENDANTS)

156.   Plaintiff incorporates by reference and realleges each allegation set forth above.

157.   California Labor Code § 1050, *et seq.*, makes it unlawful for any person, or agent or officer thereof, who, after having discharged an employee from the service of such person or after an employee has voluntarily left such service, by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment.

158.   California Labor Code § 1054 creates a private right of action by a former employee who is damaged pursuant to section 1050 to recover treble damages against the former employer.  Cal. Code Civ. Proc. § 1054 ("[A]ny person or agent or officer thereof, who violates any provision of sections 1050 to 1052, inclusive, is liable to the party aggrieved, in a civil action, for treble damages.").

159.   While employed at defendant Snap Inc., plaintiff complained to his superiors about Snap Inc.'s repeated false representations to advertisers, to investors, and to the public concerning its KPIs.

160.   As a result, defendant Snap Inc. terminated plaintiff on September 18, 2015, a mere three weeks after he started working for Snapchat.

161.   After his termination, plaintiff was being recruited by a social media company to fill a high level executive position with the company. In addition, plaintiff was presented with a number of other business opportunities in the social media industry.

162.    All such prospective employment and business opportunities disintegrated when defendants were contacted to inquire into plaintiff's employment there.

163.    Defendants made material misrepresentations to those making such inquiries, thereby preventing plaintiff from gaining employment after termination.

164.    Plaintiff was harmed and continues to be harmed by defendants' misconduct.

165.    Defendants' conduct was a substantial factor in causing plaintiff's harm.

166.    Defendants deprived plaintiff of his right to report wrongful activity to his supervisors without retaliation and termination. In committing the foregoing acts, plaintiff is entitled to reinstatement and reimbursement for lost wages and work benefits caused by the actions of defendants, plus attorney's fees and costs.

167.    In committing the foregoing acts, defendants were guilty of oppression, fraud, and malice, and, in addition to the actual damages caused thereby, plaintiff is entitled to recover damages for the sake of example and by way of punishing defendants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment in his favor and against defendants, as follows:

a.    A preliminary injunction order issue immediately, pursuant to which defendants, directly or indirectly, and whether alone or in concert with others, including any officers, agents, employees and/or representatives, shall be required to maintain the status quo between the parties until such time as a final judgment is entered in this matter, including by refraining from making any misrepresentations to any third  party concerning the facts or circumstances surrounding plaintiff's termination from Snapchat prior to such final and non-appealable award;

b.  A preliminary and permanent mandatory injunction against all defendants restoring plaintiff to the position of Growth Lead at Snapchat, according to the terms of the contract providing therefor, including the RSUs previously awarded to him

c.  Awarding plaintiff compensatory damages in an amount to be determined at trial but believed to be not less than $10 million;

d.  Awarding plaintiff special damages according to proof, including but not limited to his loss of earnings and Facebook stock and stock options, subject to doubling pursuant to Labor Code § 972;

e.  Awarding plaintiff reinstatement with back pay and back benefits for all violations of California Labor Code § 1102.5, pursuant to California Labor Code § 98.6 and actual damages for loss of income, loss of benefits, loss of use, for emotional distress, and for the injury and damage that defendant has caused to plaintiff's name and reputation, pursuant to California Labor Code § 1105;

f.  Awarding plaintiff treble damages pursuant to California Labor Code § 1054;

g.  Awarding plaintiff double back pay damages for all violations of the Sarbanes–Oxley Act;

h.  Awarding plaintiff prejudgment and postjudgment interest on such damages;

i.  Awarding plaintiff the costs of this action;

j.  Awarding plaintiff attorney's fees;

k.  Awarding plaintiff punitive damages in an amount to be determined at trial;

l.  Awarding plaintiff injunctive relief, as the Court may deem proper; and

m.  Awarding plaintiff such other and further relief as the Court deems just and proper.

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff Anthony Pompliano hereby demands a trial by jury in this action of all issues so triable.

Dated: May 16, 2017                    Respectfully submitted,

                                       **Pierce Sergenian LLP**

                                       By: /s/David A. Sergenian
                                       David A. Sergenian
                                       Attorneys for plaintiff