**Exhibit A**

DocuSign Envelope ID: DCA9BA09-195B-474F-8532-5485C8C21D50



August 14th, 2015

Anthony Pompliano
Via email: anthony.pompliano@gmail.com

**Re:    Employment Terms**

Dear Anthony,

Snapchat, Inc. (the "Company") is pleased to offer you the exempt position of Growth Lead on the following terms:

You will be responsible for strategic efforts to improve the Snapchat experience and accelerate our user growth and engagement and any other duties as assigned by the Company. You will work at our office located at 63 Market Street in Venice, California.  Of course, the Company may change your position, duties, and work location from time to time at its discretion.

You will receive an annual salary of $240,000.00, which will be paid semi-monthly, less applicable payroll deductions and tax withholdings. In the first regular payroll period following your employment start date, you will receive a one-time bonus payment of $10,000.00, less applicable payroll deductions and withholdings.  In addition, employees qualify for a range of benefits.  Check out the enclosed benefits documents for more details, or contact Recruiting for the current suite of benefits available to you.  Keep in mind that Snapchat may change compensation and benefits from time to time at its discretion.

Under the Snapchat, Inc. 2014 Equity Incentive Plan (the "Plan"), and subject to approval by the Company's Board of Directors (the "Board"), the Company will grant you an award of restricted stock units ("RSUs") with an aggregate value of at least $3,500,000.00.  If approved, the number of RSUs granted will be determined using the fair market value of the Company's Class B Common Stock as determined by the Board as of your employment start date.  RSUs will become vested RSUs subject to the satisfaction of the following two conditions: (1) the Continued-Employment Requirement (as defined below) and (2) the occurrence of a Liquidity Event (as defined below) within six-and-one-half years after the grant date of the RSUs. The Continued-Employment Requirement will be satisfied as to 10% of the RSUs after the first 12 months of your employment, as to an additional 20% of the RSUs in equal quarterly installments during the second twelve-month period of your employment, as to an additional 30% of the RSUs in equal quarterly installments during the third twelve-month period of your employment, and as to the final 40% of the RSUs in equal quarterly installments during the fourth twelve-month period of your employment (the "Continued-Employment Requirement"). The Company may, in its sole discretion, elect to hold back that number of vested shares required to cover the taxes, withholdings, and other similar obligations due upon the issuance of the vested RSU shares to you. In the event your employment with the Company terminates before a Liquidity Event has occurred, you will be issued at the time of a Liquidity Event any RSU shares for which the Continued-Employment Requirement was satisfied prior to your departure, subject to the overall six-and-one-half-year time limit of the grant. In all cases, the RSUs will be subject to the terms and conditions of the Plan and the applicable grant agreement.

If, within twelve months following a Change in Control (as defined in the Plan), (i) your employment with the Company is involuntarily terminated by the Company without Cause (as

1199572 v2/HN

DocuSign Envelope ID: DCA9BA09-195B-474F-8532-5485C8C21D50

defined in the Plan) or (ii) you resign your employment with the Company for Good Reason (as defined below) and in either case other than as a result of death or disability, the total number of RSUs that satisfy the Continued-Employment Requirement as of your last day of employment shall equal 1/16th of the RSUs for each completed quarter of your continuous employment. This accelerated satisfaction of the Continued-Employment Requirement is contingent upon (a) your continuing to comply with your obligations under any agreement between you and the Company, including without limitation your Confidential Information and Inventions Assignment Agreement and (b) your signing, delivering to the Company, and not revoking an effective separation agreement and general release of claims in favor of the Company in a form acceptable to the Company no more than 60 days after your termination date.

For purposes of this letter, "Liquidity Event" means either of the following: (a) the occurrence of a Change in Control, or (b) the effective date of a registration statement of the Company filed under the Securities Act of 1933, as amended, for the sale of the Company's Class A Common Stock.

For purposes of this letter, "Good Reason" means any of the following actions taken without Cause by the Company or a successor corporation or entity without your consent: (w) material reduction of your base compensation; (x) material reduction of your authority, duties, or responsibilities, provided, however, that a change in job position (including a change in title) shall not be deemed a "material reduction" unless your new authority, duties, or responsibilities are materially reduced from your prior authority, duties, or responsibilities; (y) failure or refusal of a successor to the Company to materially assume the Company's obligations under this offer letter in the event of a Change in Control as defined below; or (z) relocation of your principal place of employment that results in an increase in your one-way driving distance by more than 50 miles from your then-current principal residence.  In order to resign for Good Reason, you must notify the Board of the condition that you believe constitutes Good Reasons no more than 90 days after the condition arose, and allow the Company 30 days to cure such condition. If the Company fails to cure the condition within such period, then your resignation from all positions you then hold with the Company must be effective no later than 90 days after the end of the Company's cure period.

You are being offered employment at Snapchat because of the personal skills and experience you have, not because of any confidential, proprietary, or trade-secret information of a former or current employer you may have.  In your work for Snapchat, we do not want you to use or disclose any such confidential, proprietary, or trade-secret information.  Likewise, as an employee of Snapchat, you may learn about confidential, proprietary, or trade-secret information related to Snapchat and its clients.  To protect the interests of both Snapchat and its clients, all employees are required to read and sign the enclosed Confidential Information and Inventions Assignment Agreement as a condition of employment at Snapchat.  Also enclosed for you to review and then sign as a condition of employment are the Conflict of Interest Agreement, the Acknowledgement of At-Will Employment, and our Arbitration Agreement, which provides that all disputes arising out of your employment must be resolved through binding arbitration.  We encourage you to read all these documents carefully, and to seek independent legal counsel if you have any questions about the meaning or scope of these documents.

As a Snapchat employee, you will be expected to follow Snapchat policies and acknowledge in writing that you have read our Employee Handbook.  With the exception of the "employment at-will" policy discussed below, Snapchat may modify or eliminate its policies at its discretion.

Your employment with Snapchat is at-will.  This means you may terminate your employment with Snapchat at any time and for any reason whatsoever simply by notifying us.  Likewise,

1199572 v2/HN

DocuSign Envelope ID: DCA9BA09-195B-474F-8532-5485C8C21D50

Snapchat may terminate your employment at any time, with or without cause or advance notice. Your employment at-will status can be modified only in a written agreement signed by you and by an officer of Snapchat.

This offer is contingent upon a background-check clearance, reference check, and satisfactory proof of your right to work in the United States.  You agree to assist as needed and to complete any documentation at Snapchat's request to meet these conditions  This letter, together with your Confidential Information and Inventions Assignment Agreement and your Arbitration Agreement, forms the complete and exclusive statement of your employment agreement with Snapchat.  It supersedes any other agreements or promises made to you by anyone, whether oral or written.  Changes in your employment terms, other than those changes expressly reserved to Snapchat's discretion in this letter, require a written modification signed by an officer of Snapchat.

Please sign and date this letter, the enclosed Confidential Information and Inventions Assignment Agreement and Arbitration Agreement, and return them all to me by August 21, 2015, if you wish to accept employment at Snapchat under the terms described above.  If you accept our offer, we would like you to start on August 31st, 2015.

We look forward to your favorable reply and to a productive and enjoyable work relationship.

Sincerely,

*Simmi Singh*

Simmi Singh, Chief Talent Officer

**Accepted and agreed:**

*Anthony Pompliano*

Anthony Pompliano

8/14/2015

Date

Attachments:   Confidential Information and Inventions Assignment Agreement
Arbitration Agreement

1199572 v2/HN